697 P.2d 1150

IHC HOSPITALS, INC., a nonprofit Utah corporation, doing business as Primary Children's Medical Center, Plaintiff-Appellant,

v.

BOARD OF COMMISSIONERS, Defendant-Respondent.

INTERMOUNTAIN HEALTH CARE, INC., a nonprofit Utah corporation, doing business as Primary Children's Medical Center, Plaintiff-Appellant,

v.

BOARD OF COMMISSIONERS OF TWIN FALLS COUNTY, Idaho, Defendant-Respondent.

Nos. 15302, 15303.

Supreme Court of Idaho.

Feb. 4, 1985.

138

Larry Lee Goins, Idaho Falls, for plaintiff-appellant.

Lloyd J. Webb, of Webb, Burton, Carlson, Pedersen & Paine, Twin Falls, for defendant-respondent.

SHEPARD, Justice.

These are consolidated appeals from the orders of the district court, which summarily affirmed rulings of the Board of Commissioners of Twin Falls County rejecting claims of IHC Hospitals, Inc. for costs allegedly incurred in caring for infant children of medically indigent parents. We affirm in part, reverse in part, and remand for additional proceedings.

The first issue presented for decision concerns the degree and nature of proof required from a hospital to sustain its claim for the costs of medical care to newborn infants whose parents are allegedly medically indigent. In the instant case, it appears that intransigence existed in the position of each party, the county commissioners asserting that claims for reimbursement must be supported by "expert" testimony, and on the other hand the hospital contending that its claim need not be established by expert proof of the medical necessity for the care or of the reasonableness of the charges therefor by testimony of persons competent to so testify. We conclude that neither party is completely correct in its position.

The second issue involves the burden of proof as between the parties here as to medical indigency. Substantially involved in both issues presented are Idaho's medical indigency statutes, Idaho Code Title 31, Chapters 34 and 35, and our Administrative Procedure Act, Idaho Code Title 67, Chapter 52.

IHC Hospitals, Inc. is the corporate owner of Primary Children's Medical Center, a hospital located in Salt Lake City, Utah, where three newborn infants were given extensive emergency medical treatment. Since the children had been born in Twin Falls, Idaho, plaintiff hospital requested reimbursement from the County of Twin Falls for the costs incurred, to the extent that such costs were not covered by federal Medicaid funds or by other available sources of money. Following a hearing, the county board of commissioners entered findings that the evidence tendered by IHC was not sufficient to establish the need for the care rendered by the hospital, nor sufficient to establish that the charges made for that care were reasonable. In two of the cases, the commission further held that the

proof was insufficient to establish the medical indigency of the infants' parents. Upon appeal to the district court, the rulings of the Board of Commissioners of Twin Falls County were summarily affirmed. The facts of each case, to the extent that they are contained in the record, are largely undisputed and are summarized below.

### 1. GARDOSKI CASE.

The infant Gardoski was one of twin children born in Twin Falls, Idaho, on October 7, 1982. Her parents already had four other children, and they had an annual income of $8,400, no health insurance, and minimal assets. In her first week of life, the infant developed abdominal distention, and she was transported to Primary Children's Medical Center at Salt Lake City for emergency surgery. She was released from the hospital on October 30 but returned again on December 5 for additional surgery. The charges for those hospital stays totaled approximately $17,000. The Gardoskis applied for assistance from Twin Falls County, and the Board of Commissioners, following a prehearing conference, initially denied that application.

Counsel for the county, by correspondence dated March 8, 1983, indicated that it was anticipated that the hospital would request an administrative review of the denial of the Gardoski claim, and that the commissioners felt the claim, or parts of it, did not reflect "regular hospital charges" within the meaning of I.C. § 31–3508. The letter further stated:

> "During the course of that review, we will expect the Primary Children's Medical Center to be prepared to present testimony in detail and in depth as to the charges culminating in this claim. It will be necessary that there be presented testimony as to the reasonableness of the charges by someone qualified to speak to that subject. In view of the extent of this claim, I would anticipate that such a hearing would take the better part of a day...."

On May 10, 1983, a hearing was held, at which IHC tendered as evidence the Gardoskis' application for indigent assistance and a computerized hospital bill. The credit manager of the hospital testified to the effect that the charges stated on the computerized bill "were normally and necessarily made by Primary in connection with the care of the medically indigent patient;" that the hospital's billing procedure was that when an order for treatment is written by a nurse or doctor, the care so ordered is given, a charge slip is written by the person administering the care, the charge slips are collected and the charges posted nightly on the computer; that the rates charged for services rendered are set by the hospital administration and the hospital governing board, after recommendation from the department in charge of the treatment; that the charges imposed in the Gardoski case were normal and necessary, because "the physician ordered the treatment, and we have no—we have no way to—we do not question his, what he orders. If he feels she needs it, the treatment is given to her." The credit manager testified further that the hospital never refuses admission of a child who needs its care, that staff physicians have sole authority to admit patients, and that, because charity funds are limited, the hospital has a policy of exhausting all other sources of funds before turning for money to charitable institutions. Mr. Gardoski testified that, besides the twins born on October 7, 1982, the other four children in the family were children of a former marriage of Mrs. Gardoski to one Raymond Adams. Gardoski and his wife both indicated that the whereabouts of Adams or of his relatives was unknown, and that Adams had not been paying child support.

Following the hearing, the county commissioners denied IHC reimbursement for the care of the infant Gardoski, stating:

"I.

"The proof offered by the applicants was insufficient to establish that the hospital care, the expense of which is sought from Twin Falls County, was needed in the treatment of Bernadette Jo Gardoski.

No witnesses were called who were qualified to give testimony as to the need for the care rendered by the hospital, and there was no other legally acceptable evidence of the need for that care.

"II.

"The proof offered by the applicants was insufficient to establish that the charges made by Primary Children's Hospital, which are the subject of the application and claim, were reasonable charges. No witness was called who was qualified to give an opinion as to the reasonableness of the charges, and the reasonableness thereof was not otherwise established by legally acceptable evidence.

"III.

"The applicants were made aware of the need for acceptable proof of the foregoing elements of the claim by the letter of Lloyd J. Webb written on behalf of the Board of County Commissioners for Twin Falls County, Idaho, on March 8, 1983....

"IV.

"The proof offered by the applicants was insufficient to establish the indigency of Joseph Gardoski and Judy Gardoski according to the standards of indigency heretofore promulgated by the Board of County Commissioners for Twin Falls County, Idaho, it appearing that the Gardoskis would have sufficient income to respond to the hospital claim in question, assuming its validity, if Judy Gardoski was paid child support required to be paid by divorce decree entered by a Wyoming Court against her former husband. Judy Gardoski has seen fit not to enforce or attempt to enforce that child support provision for reasons which were unclear to the Board of County Commissioners, even though the County Commissioners, in informal conference on January 25, 1983, strongly urged Judy Gardoski to take advantage of the services of the

Twin Falls County Prosecuting Attorney's staff for that purpose through a Uniform Reciprocal Support Action. At least on the state of the present record, there is no reason to believe that the child support obligation of Mrs. Gardoski's previous husband could not be enforced should Mrs. Gardoski see fit to attempt its enforcement."

## 2. CANDELARIA CASE.

The Candelaria infant was born two months premature on November 9, 1982, and was critically ill, suffering from complex respiratory system problems. He was transferred to Primary Children's Medical Center. The hospital made a claim for alleged costs not covered by Medicaid, in excess of $25,000. The county denied that claim, and an administrative hearing was held before the Board of County Commissioners.

The infant was the son of a single woman whom the county and hospital have, since the release of the infant from Primary, been unable to locate. Medical exhibits tendered by the hospital during the hearing indicate that the mother and father of the infant were separated, that the father lived in Las Vegas, and that the mother had resided in Idaho and was on welfare.

During the hearing before the county commissioners, the same credit manager of the hospital as testified in the Gardoski matter testified as to the hospital's procedure in ordering treatment and the nature of the hospital's charges. She admitted, however, that she had no expertise in setting costs of medical care. Following the hearing, the Board of County Commissioners denied reimbursement to the hospital, stating:

"FINDINGS OF FACT

" * * *

"5. Claimant and Primary have failed to sustain their burden of proving that a readily available resource for payment, the natural father of Michael Candelaria, is indigent. The record indicates little

more than a half-hearted attempt on the part of Claimant and Primary to provide the County with sufficient credible information upon which to make a finding of indigency. Claimant's mother failed to respond to a subpoena and registered letter requesting her appearance at the hearing before this Commission.

## CONCLUSIONS OF LAW

"1. Proof of medical indigency is an indispensable part of a claim for relief under the Idaho Medical Indigency Statutes. Both Claimant and Primary have failed to meet their burden of proof on the issue of medical indigency insofar as they have made no bona fide effort to provide the Commission with financial resources or lack thereof of the natural father of Michael Candelaria. It may well be that the natural father is and was during all pertinent times adequately insured to cover this claim, however neither Primary nor Claimant have provided any evidence whatsoever on the financial capability of the natural father as is their duty.

"2. An additional part of the proof which a Claimant must make in a claim under the Idaho Medical Indigency Statutes is a credible showing of the medical necessity for the care alleged to have been given and also the reasonableness of the charges for such care. The Commission is bound by law to disburse only such monies as are legally warranted. It cannot speculate or hope that a claim for monies is credible or accurate. It must apply traditional principles of proof on the issue. Before both judicial as well as administrative tribunals, proof of the necessity and reasonable cost of expert services must be established by expert testimony. The profferred witness in the case is by her own admission no expert in medical care or in derivation or establishment of costs for medical services. She is a credit manager and merely seeks to enforce payment on work purportedly done by experts."

## 3. WILLIAMS CASE.

When the infant Williams was born on December 1, 1982 in Twin Falls, he had a congenital lack of continuity of the esophagus, because of which he was immediately transferred to Primary Children's Medical Center for surgery. He was born to a married couple residing in Twin Falls, who testified that they had a monthly income of $300, no health insurance, and no assets of any value. The parents and Primary Hospital applied to Twin Falls County for assistance for the cost of that medical care, which cost was approximately $36,000. The claim was initially denied, following which the hospital requested and was granted an administrative hearing before the county commissioners.

At that hearing, the same hospital credit manager testified to largely the same information as she had in the Gardoski case, and she also testified that her function was solely in the collection of accounts, that she was not a doctor or a nurse, that she had no involvement in establishing the hospital's rates, that she did not serve either in administration or on the governing board of the hospital, that she was not involved in the decisions as to the infant Williams' treatment, and that she did not know what rates the staff doctors charged for given services.

The Board of County Commissioners thereafter denied the hospital's claim, stating:

### "FINDINGS OF FACT

" * * *

"4. Timely objections to proof offered by Primary and Claimant as to the necessity for medical treatment and reasonableness of charges therefor were made by the County. The Commission earlier reserved rulings on those objections and now enter rulings sustaining those objections. No proof exists in the record establishing either the medical necessity for the care allegedly given Claimant nor the reasonableness of charges therefor.

## CONCLUSIONS OF LAW

"1. Part of the proof which a claimant must make in a claim under the Idaho Medical Indigency Statutes is a credible showing of the medical necessity for the care alleged to have been given and also the reasonableness of the charges for such care. The Commission is bound by law to disburse only such monies as are legally warranted. It cannot speculate or hope that a claim for monies is credible or accurate. It must apply traditional principles of proof on the issue. Before both judicial as well as administrative tribunals, proof of the necessity and reasonable cost of expert services must be established by expert testimony. The proffered witness in the case is by her own admission no expert in medical care or in derivation or establishment of costs for medical services. She is a credit manager and merely seeks to enforce payment on work purportedly done by experts."

The Williams case therefore differs from the Gardoski and Candelaria cases, in that in Williams the Board of County Commissioners did not assert a lack of proof of medical indigency as a basis for denying the claim.

## DISCUSSION OF ISSUES PRESENTED

As indicated in the rulings of the Board of County Commissioners, and as presented and argued to this Court, the county asserts that it may impose a requirement of expert testimony upon the hospital, in order to authenticate the hospital's claim against the county. On the other hand, the position of the hospital appears to be that its evidence tendered at the hearing before the Board of County Commissioners was sufficient to require the Board to allow its claims, *i.e.*, that the Board could not require expert medical testimony that the condition of the infants in each case necessitated the care given by the hospital or testimony by a qualified witness that the charges demanded by the hospital for the given care were reasonable.

It is our opinion that the position of each party in this regard is extreme and that neither is correct.

■ It is clear that as a commission authorized to determine contested cases, the county board of commissioners here falls within the Administrative Procedure Act, I.C. § 67–5201(1), and hence the rules of evidence used in non-jury civil cases are statutorily required to be used in these hearings by the county commission. I.C. § 67–5210. We reject the hospital's assertion that by requiring "expert" testimony, the county commissioners have improperly promulgated a new administrative rule requiring expert testimony as a condition to reimbursement.

■ An "expert" in a court proceeding is someone possessing skill or knowledge beyond the competency of the average juror. Formal training or an advanced degree is not essential to qualify a witness as an expert, but practical experience or special knowledge must be shown to bring a witness within the category of "expert." Further, admission of expert testimony is in the discretion of the trial court. *Stoddard v. Nelson,* 99 Idaho 293, 581 P.2d 339 (1978); *Bean v. Diamond Alkali Co.,* 93 Idaho 32, 454 P.2d 69 (1969). This view of evidentiary expertise is consistent with the Federal Rules of Evidence, specifically Fed. R.Evid. 702. *See also* notes of the Advisory Committee on the Proposed Federal Rules, as to Rule 702. But an expert, like any other witness, must be competent to testify on the matter before the court. McCormick explains:

"An observer is qualified to testify because he has firsthand knowledge of the situation or transaction at issue. The expert has something different to contribute. This is a power to draw inferences from the facts which a jury would not be competent to draw. To warrant the use of expert testimony, then, two elements are required. First, the subject of the inference must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman ... Second,

the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth. The knowledge may in some fields be derived from reading alone, in some from practice alone, or as is more commonly the case, from both. While the court may rule that a certain subject of inquiry requires that a member of a given profession, as a doctor, an engineer or a chemist, be called, usually a specialist in a particular branch within the profession will not be required. The practice, however, in respect to experts' qualifications has not for the most part crystallized in specific rules, but is recognized as a matter for the trial judge's discretion reviewable only for abuse. Reversals for abuse are rare." McCormick on Evidence § 13 (2d ed. 1972).

Bell, Handbook of Evidence for the Idaho Lawyer (Publishers Press, 2d ed 1972), states, at pp. 63–64:

"Expert testimony is the testimony of persons who are particularly skilled, learned, or experienced in a particular art, science, trade, business, profession or vocation, a thorough knowledge of which is not possessed by men in general. *Sturgis v. Garrett,* 85 Idaho 364, 379 P.2d 658 (1963). *The competency of a proposed expert must first be determined by the court and should be settled before he is allowed to testify.* The admission of opinion evidence by an expert is largely discretionary with the trial court. *Jensen v. Boise-Kuna Irrigation District,* 75 Idaho 133, 269 P.2d 755 (1954); *Smith v. Big Lost River Irrigation District,* 83 Idaho 374, 364 P.2d 146 (1961). The weight to be given his testimony is for the jury. *Hard v. Spokane International Ry. Co.,* 41 Idaho 285, 238 Pac. 891 (1925); *State v. Blair,* 91 Idaho 137, 417 P.2d 217 (1966). A witness need not be qualified in the highest degree, nor in any particular degree, to make his opinion on a question admissible. It is sufficient if he has some peculiar qualification, more knowledge than jurors are supposed ordinarily to have. *Basye v. Hayes,* 58 Idaho 569, 76 P.2d 435 (1938). The case of *State v. Neil,* 58 Idaho 359, 74 P.2d 586 (1937), recognized the function of an expert witness and the reason why an expert is permitted to testify. The court in that case held that where the jury would be as well equipped to draw inferences from evidence as the expert witness, it was not error to refuse to allow the witness to give his opinion. Likewise in *Dewar v. Taylor,* 43 Idaho 111, 249 Pac. 773 (1926), the court recognized that logging is a business in which experts are competent to testify as to the methods used. The court stated that knowledge concerning such a business cannot be said to be within the common knowledge of jurymen. See also *State v. Hendel,* 4 Idaho 88, 35 Pac. 836 (1894)." (Emphasis added.)

■ Turning to the instant cases, we hold there was simply a failure of proof by a competent witness that the medical treatment rendered was necessary, which proof is required by I.C. § 31–3407, or that the charges claimed by the hospital were reasonable, as must be proved under I.C. § 31–3508. The credit manager of the hospital was candid in admitting that she had no expertise in the medical area, nor did she possess firsthand knowledge which would permit her to testify as to the necessity for the care given. She was likewise frank in stating the scope of her duties and responsibilities as credit manager, and in conceding her lack of knowledge as to the reasonableness of the charges claimed by the hospital. At bottom, the problem with the witness was not that she was not an expert, but rather that she was not competent to testify as to the issue before the county board, *i.e.,* necessity and reasonableness of the charges. Her testimony showed only that a doctor or doctors had ordered certain care, and that when such care had been given, charges therefor had been made in accordance with rates set by someone other than herself. Simply put, such quantum of "proof" is insufficient to

sustain the burden of a plaintiff or claimant in a legal proceeding.

■ We hold that the blanket requirement of the county commissioners, for presentation of "expert" testimony in these cases, is not necessarily correct; the type of testimony warranted can only be determined on consideration of the facts in each case. In light of this holding, we reverse and remand for further proceedings.

We are aware of the position of the hospital, as expressed by its counsel, that it is simply unfair and unduly burdensome to the hospital to require the attendance of its physicians to give testimony at such hearings. While we have some sympathy with that position, we also must point out the astronomical sums claimed by the hospital for the treatment of these infants. It may strain the bounds of credulity to assume that the complex medical procedures performed on these infants were not necessary, but this Court has no firsthand knowledge of these infants, nor are we medical experts. We assume the Board of County Commissioners of Twin Falls shares to some extent our lack of expertise.

We further note that the county commissioners expressed to the hospital, in advance of the hearings, their concern regarding the reasonableness of the charges. We attribute to the county commissioners no more expertise than this Court can claim in the field of hospital administration, and specifically in the setting of particular rates for particular medical services and in how the rates claimed here compare with those of other institutions. See I.C. § 31-3502, defining "reimbursement rates."

Since the causes consolidated here are to be reversed for further proceedings, and for guidance in other such cases, we express our disagreement with the position asserted by counsel for the hospital that a requirement in these cases that competent testimony be presented at the hearing—which requirement, in many instances, will be conducive to the presentation of expert evidence—is unworkable and an unfair imposition upon health care providers. While it may be inconvenient for physicians or other competent personnel to attend hearings, particularly at the distance required here, we see alternatives to their actual attendance which will accomplish the same result. For many years, in proceedings before the Industrial Commission, where the costs of medical treatment are minuscule as compared to those in the cases at hand, we have seen almost all of the necessary medical testimony introduced by way of affidavit or deposition. See also Sykes v. C.P. Clare and Co., 100 Idaho 761, 605 P.2d 939 (1980); Comish v. J.R. Simplot Fertilizer Co., 86 Idaho 79, 383 P.2d 333 (1963), as to requirements for expert medical testimony in Industrial Commission cases. It would also seem clear that if an attending physician at these births in Twin Falls deemed it necessary to transfer an infant to a specialized care hospital, the testimony of such a Twin Falls physician would not only be valuable to the Board of Commissioners, but would be acquired with relative convenience.

■ We turn now to the hospital's assertion that the Board of Commissioners of Twin Falls County erred in placing upon the hospital the burden of proving indigency of the infant patients in question. We note at the outset that, as a recipient of federal funds under the Hill-Burton Act, 42 U.S.C. §§ 291, et seq., the hospital has obligated itself to provide a certain level and amount of care to the medically indigent. 42 U.S.C. § 291c(e)(2); 42 C.F.R. § 53.111. See Braun v. Ada County, 102 Idaho 901, 643 P.2d 1071 (1982). At any rate, plaintiff's credit manager testified that the hospital does not refuse admission of any child, regardless of the ability of that child's family to pay for medical care.

Under Idaho's medical indigency statutes, Idaho Code Title 31, Chapters 34 and 35, a hospital desiring reimbursement from a county for services extended to indigents is generally required to jump through several procedural hoops prior to giving the care. A person who is allegedly indigent must submit a completed written application ten days before being admitted. I.C. § 31-3404. In turn, under I.C. § 31-3509,

a hospital claiming reimbursement for the hospitalization of medically indigent persons must make "all reasonable efforts to determine liability for the account so incurred from any available insurance or other sources available for payment of such expenses *prior* to submitting the bill to the county for payment." An exception is made to this strict investigative duty of the hospital, in the case of emergency care provided to indigents. I.C. § 31–3407, after setting out the requirement that a county pay claims for indigent care only after the filing and approval of a proper application, states, "[A] claim against the county shall be allowed for services rendered prior to approval of the application heretofore mentioned where a hospital renders the services to a medically indigent person in an emergency and subsequently there is obtained said approval heretofore mentioned." The hospital has 45 days in which to submit the application for reimbursement on emergency medical services provided to indigents. However, "[t]he chargeable county ... shall be notified as soon as practicable *upon the hospital's obtaining information disclosing that a patient is medically indigent.*" I.C. § 31–3504.

The county, on the other hand, also has a reciprocal obligation to make reasonable inquiry into each application for indigent medical claims. As a starting point, it must be remembered that the county is obligated under state statute to care for and maintain the medically indigent. I.C. § 31–3503. In a non-emergency setting, the county must investigate both the claimed indigency and the need for the care requested. I.C. § 31–3405. The county commissioners "shall," after determining that the applicant is medically indigent, make the necessary provisions for his relief. I.C. § 31–3406. I.C. § 31–3508 provides, "The county responsible for payment of hospitalization of a medically indigent person shall pay an amount not to exceed the reimbursement rates to the hospital rendering such services." "Reimbursement rates" are in turn defined under I.C. § 31–3502(4) as "the unadjusted medicaid

rate of reimbursement for medical charges allowed pursuant to title XIX of the social security act, as amended."

 We do not anywhere find a clear explanation of precisely what a hospital must demonstrate, as to the question of indigency, in order to obtain reimbursement in these emergency medical situations involving indigents. We believe that a standard of reasonableness can certainly be inferred from the wording and spirit of the statutory scheme, *i.e.,* if a hospital gives emergency treatment to an indigent in an emergency situation without the county board of commissioners' prior approval, as the hospital is allowed to do under I.C. § 31–3407, then the hospital must use diligence in gathering all reasonably available information relevant to the indigency of the patient, and the hospital should do so as soon after the admission of the patient as is possible. The county, however, cannot place the entire burden of proving indigency, and the entire risk of non-payment, upon the hospital. Unless there is reason to believe the hospital has been recalcitrant in investigating the claim of indigency, then, after presentation of some proof of indigency (not necessarily a prima facie showing) by the hospital, then the claim must be paid—this, assuming proof that the care was actually given, that it was necessary, and that the charges rendered therefor were reasonable.

We treat each of the consolidated cases in turn.

 In the case of Bernadette Gardoski, the evidence presented to the county commissioners amounted to a prima facie case of medical indigency. The county's only asserted rebuttal to the hospital's claim for reimbursement in this case was the possibility of child support being collected from Mrs. Gardoski's former husband. Even assuming that such an expectancy of payment of overdue child support for the other children existed as a source of funds, it is established that child support for particular children is designated specifically for support of the named children;

such moneys are not intended to be the property of the parents. *Koester v. Koester*, 99 Idaho 654, 586 P.2d 1370 (1978); *Alber v. Alber*, 93 Idaho 755, 472 P.2d 321 (1970). Therefore, the parents'. potential collection of child support for the benefit of their children cannot be the basis for the county's denial of indigency status.

■ In the case of Shawn Williams, the county did not find against Primary Children's Medical Center on the indigency issue. Mr. Williams' testimony that his take-home pay was $400 monthly; that the family has five children; that their assets consisted of a car valued at $300 and a black and white television; and that they had no insurance, certainly established indigency. This evidence was not rebutted by the county. Therefore, on remand, the Williams family will be deemed to have established a prima facie case of medical indigency.

■ The case of Michael Candelaria is perhaps the most difficult of the three matters presented here, because the whereabouts of either of Michael's parents are unknown. The mother failed to respond to a subpoena ordering her to appear at the hearing before the board. The county's own deputy clerk, whose responsibilities include investigating indigence claims, spoke personally with the mother, Juanita Candelaria, in March 1983 and failed to ask her who the child's natural father was, his income, or his whereabouts. The hospital's records have only limited information on the father of the Candelaria child, but the hospital at least made some effort to get information on the father. We hold that, in a case of this kind, where neither parent can be found and the claimant hospital has made reasonable effort to ascertain the child's indigency, the hospital will be held to have made a prima facie showing of medical indigency, and the burden of proof on the question of indigency will then shift to the county. In so holding, we are cognizant of the county's superior ability to investigate these claims. First, pursuant to I.C. § 31–3405, the county routinely investigates the credibility of such claims. Fur-

thermore, I.C. § 32–1002 clothes the county with authority to sue a father, mother, or child of a person who has received county aid, for reimbursement of amounts so expended by the county. The county has a prosecutorial staff which is professionally trained to handle claims against wayward parents for arrears in child support, and to uncover the whereabouts and financial abilities of such parents. *See* I.C. § 32–710A (making the county prosecutor responsible for enforcement of child support payments); I.R.C.P. 6(c)(5) (referring to the county prosecutor's involvement in support hearings).

We emphasize the narrow scope of our ruling on the Candelaria matter. Our holding today is limited by the facts of the Candelaria case, and, to the extent it also is applied to Gardoski and Williams, by the facts presented in those cases. The facts which make these cases peculiar and which militate toward our finding in favor of the hospital on the question of the burden of proving indigency are: 1) that the patients are newborns; 2) that the medical needs of the children are emergency in nature; and 3) that, in Candelaria, the father's identity and location are unknown and the unmarried mother has very recently been on welfare.

The consolidated cases are remanded for further proceedings in accordance with this opinion. Each side to bear its own costs and attorney's fees on appeal.

DONALDSON, C.J., and BISTLINE and HUNTLEY, JJ., concur.

BAKES, Justice, concurring specially:

I concur in most of the majority opinion and write only to point out that, while I agree that a credit manager would probably not be competent to testify regarding the reasonableness of charges and the necessity for medical procedures employed, I believe that a qualified hospital administrator or assistant would be sufficiently qualified as an expert in order to testify in these cases if the administrator had reviewed the patient's medical records as well as the

hospital's records of charges incurred. Such a witness would be the most qualified person to testify regarding the reasonableness of the charges for the particular procedures or services rendered, and would be sufficiently qualified to testify concerning the reasonableness of the medical treatment after reviewing the medical records. As the majority opinion points out, an expert need only be someone possessing skill or knowledge beyond the competency of the "average layman." There is no need that the witness be the most competent person to testify on those particular items, only that the witness possess skill or knowledge beyond the competency of the average layman. And if the majority is correct in its statement that "we attribute to the county commissioners no more expertise than this Court can claim in the field of hospital administration, and specifically in the setting of particular rates for particular medical services," then it shouldn't be too difficult to qualify a hospital administrator as an expert in order to testify in these matters.

I concur in the majority's reference to other administrative agencies' practice of allowing affidavits and depositions, and note only that defendants who unreasonably object to the use of such means of proving expert evidentiary matters and who unnecessarily insist upon experts personally appearing at those hearings might well be subjected to costs under I.C. § 67–5215(g) and I.R.C.P. 54(d)(1), and attorney fees under I.C. § 12–117.